KYLE SCHUMACHER (BAR #121887)
kschumacher@perryshields.com
**PERRY, SHIELDS, CAMPBELL, FLOYD, PLLC**
227 N. Loop 1604 E. Ste. 130
San Antonio, TX. 78232
503-482-8137 ph
281-715-3209 fax

Attorneys for Plaintiff
Justin Law De Lauriston

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON – PORTLAND DIVISION

| | |
|---|---|
| Justin Law De Lauriston**,**<br><br>                Plaintiff,<br><br>    v.<br><br>Equifax Information Services, LLC; Bank of the West; and DOES 1 through 100 inclusive,<br><br>                Defendants. | CASE NO.  3:20-cv-00144<br><br>PLAINTIFF'S COMPLAINT FOR DAMAGES:<br><br>1.  Violation of Fair Credit Reporting Act |

COMES NOW Plaintiff **JUSTIN LAW DE LAURISTON** ("Plaintiff" or "Lauriston"), an individual, based on information and belief, to allege as follows:

## INTRODUCTION

1. This case arises under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681e(b), 1681i(a)(2)(A), 1681i(a)(4), and 1681i(a)(5)(A). Plaintiff seeks redress for the unlawful and deceptive practices committed by the Defendants in connection with their inaccurate, misleading, or incomplete reporting of Plaintiff's debt included in Plaintiff's Chapter 7 bankruptcy.

2. Here, Defendant Bank of the West, (the "Defendant Bank") is not reporting that Plaintiff's account was included and discharged in bankruptcy.

3. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking

system and unfair credit reporting methods undermine the public confidence that is essential to the continued functioning of the banking system.

4. A pervasive and fundamental misunderstanding presently thrives in the United States regarding the long-term impact that filing a consumer bankruptcy has on the consumer's creditworthiness. Specifically, consumers tend to believe that since a bankruptcy can be reported on their credit report for ten (10) years, their creditworthiness will be ruined for the same length of time. This is not true.

5. The *majority* of consumer debtors file a consumer bankruptcy to *raise* their FICO Score and remedy their poor creditworthiness.

6. In fact, it is possible for consumer debtors to obtain a 700 FICO Score as soon as twelve (12) months from filing a consumer bankruptcy (Chapter 7 or Chapter 13).

7. Creditors and lending institutions are aware of the misconception that filing a consumer bankruptcy destroys the consumer's creditworthiness of ten (10) years; however, to perpetuate this bankruptcy myth, creditors intentionally and routinely ignore industry standards for accurately reporting bankruptcies, as well as the debts included in those bankruptcies, to keep consumers' credit scores low and their interest rates high.

8. Creditors know that deviating from recognized credit reporting standards will make it difficult for to consumers to raise their credit scores and improve their creditworthiness.

9. This was not the intent of Congress when it enacted the Fair Credit Reporting Act and the Bankruptcy Abuse Prevention and Consumer Protection Act.

## JURISDICTION & VENUE

10. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

11. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, 1367, and 15 U.S.C. 1681.

12. This venue is proper pursuant to 28 U.S.C. § 1391(b)(1).

13. Plaintiff alleges that, for purposes of establishing residency under 28 § 1391(b)(1), each named Defendant conducts sufficient business within the forum state and this Court has personal jurisdiction over Defendants under 28 U.S.C. §§ 1391(c)(2) and 1391(d).

## GENERAL ALLEGATIONS

14. Plaintiff alleges that the Defendant Bank was included in Plaintiff's Chapter 7 bankruptcy filing in that each debt occurred pre-petition and was subsequently discharged.

15. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

16. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can, and often does, result in the denial of credit, higher interest rates, and prompts a negative inference that would not be drawn if the data were reported in accordance with the recognized industry standard.

17. Plaintiff alleges that all of Defendant's actions alleged herein were committed knowingly, intentionally, and in reckless disregard for credit reporting industry standards to purposefully undermine Plaintiff's ability to repair his FICO Score.

18. In the alternative, Plaintiff alleges that each and every Defendant's actions were the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

## FACTUAL BACKGROUND

19. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   FICO, Inc.**

20. FICO is a leading analytics software company with its principal headquarters in San Jose, California. FICO has over 130 patents related to its analytics and decision management technology and regularly uses mathematical algorithms to predict consumer behavior, including credit risk.

21. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent (90%) of lending decisions.

22. A FICO Score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

23. Base FICO Scores range from 300 to 850, while industry specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

24. Different lenders use different versions of FICO Scores when evaluating a consumer's creditworthiness.

25. There are twenty-eight (28) FICO Scores that are commonly used by lenders.

26. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

27. The three largest CRAs are Experian Information Solutions, Inc. ("Experian"); Equifax Information Services, LLC ("Equifax"); and TransUnion, LLC ("TransUnion").

28. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models, or algorithms, are based on the premise that the information provided by the CRAs is accurate and complies with credit reporting industry standards.

29. There are five (5) key factors that a FICO Score considers: (1) payment history; (2) amount of debt; (3) length of credit history; (4) new credit; and (5) credit mix.

30. Each of the five (5) factors is weighted differently by FICO.

31. In other words, thirty-five percent (35%) of a consumer's FICO Score relates to payment history, thirty percent (30%) relates to the amount of debt, fifteen percent (15%) relates to the length of credit history, ten percent (10%) relates to new credit, and the final ten percent (10%) relates to a consumer's credit mix, which is the different types of debts reported.

32. Payment history refers to whether a consumer has paid their bills in the past, on time, late, or missed payments. The more severe, recent, or frequent the late payment information, the greater the impact on a FICO Score. Public record items, such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

33. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

34. Once a delinquent account has been remedied, the longer the account stays current the more a consumer's FICO Score should increase.

35. FICO Scores are entirely dependent upon information provided by data furnishers ("DFs"), such as banks and other financial institutions, to CRAs.

36. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both Chapters have the same

level of severity with respect to their FICO Score and FICO uses the *filing date*, under both Chapters, to determine how long ago the bankruptcy took place.

**B.    Metro 2**

37.    The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening, and collection services industries.

38.    The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by CDIA to universally report debts in a particular manner that is understood to be the most accurate in reporting a debt. In other word, the Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

39.    The CDIA's Metro 2 format is the credit reporting industry standard for accurate credit reporting.

40.    The credit reporting industry at large depends upon the Metro 2 format and the CDIA's recommendations for reporting debt accurately.

41.    The CDIA is *the* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a.    The CDIA offers a FCRA certificate program for all CRAs.

    b.    The CDIA offers a FCRA awareness program for all CRAs.

    c.    The CDIA offers a FCRA certificate program for DFs.

    d.    The CDIA offers a FCRA awareness program for DFs.

    e.    The CDIA offers a Metro 2 learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 format as well as the relationship between multiple fields.

    f.    The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

    g.    The CDIA developed a credit reporting resource guide for accurately reporting credit.

42.    The CDIA's Metro 2 format is accepted by all CRAs.

43.    The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's credit reporting resource guide ("CRRG").

44. The CRRG outlines the industry standards for most accurately reporting debts using Metro 2 format.

45. The CRRG is not readily available to the public. It can be purchased for $229.45.

46. Even if a buyer is ready, willing, and able to pay for the CRRG, the CDIA will **not** grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

47. When FICO calculates credit scores, the algorithms use Metro 2 information based on industry standards established by the CDIA.

48. The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

49. If the Metro 2 data received by FICO deviates from industry standards, an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk resulting in less favorable lending terms.

**C.    e-OSCAR**

50. e-OSCAR is the web-based, Metro 2 compliant system developed by Experian, Equifax, TransUnion, and Innovis that enables DFs and CRAs to create and respond to consumer credit disputes.

51. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-OSCAR to the appropriate DF.

52. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file e.g., "Account Type" "07" (07 in Metro 2 refers to a Charge Account).

**D.    Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator**

53. When a consumer files bankruptcy, certain credit reporting industry standards exist.

54. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's creditworthiness.

55. The Consumer Information Indicator ("CII") is a critical field in the Metro 2 format that indicates a special condition that applies to a specific consumer.

56. Under Metro 2, the CII must be reported on only the consumer to whom the information applies.

57. It is the credit reporting industry standard to report a very specific CII upon the filing of a consumer bankruptcy.

58. In the consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed and is active, but no discharge has been entered.

59. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed and is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a tradeline. Such reporting alerts any potential lender that the account is no longer in a collectable status and is being handled by a Chapter 13 trustee.

60. The CII Metro 2 Code "Z" indicates that a bankruptcy petition has been filed, but the chapter is undesignated/unknown.

61. The CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

62. The CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged. In addition, post discharged balances and past due balances should be updated to reflect zero (0) balances. The payment history should also not reflect missed payments moving forward.

63. The CII field is a critical field for consumers as it directly relates and impacts a consumer's creditworthiness.

64. The lack of a CII reported makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

65. Furthermore, the lack of a CII reported suggests that creditors are free to collect against a consumer as an individual, or that no stay exists to prevent *in personam* collection activity.

66. Failure to report the correct CII indicator will prompt those making credit decisions to draw a more negative inference than if the appropriate CII indicator were reported.

67. The FRCA permits a bankruptcy to be reported for ten (10) years from the date the bankruptcy was *filed*.

68. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

69. The bankruptcy's impact on a consumer's FICO Score lessens with the passage of time.

70. Accordingly, the failure to reference the bankruptcy filing (CII field) and/or the correct petition date results in a lower FICO Score, which in turn causes credit decision makers to draw a more negative inference regarding a consumer's creditworthiness.

E. **Plaintiff's Debt was Discharged Pursuant to Chapter 7 Bankruptcy**

71. Plaintiff filed a voluntary petition for Chapter 7 bankruptcy on June 28, 2019 in order to repair his creditworthiness and FICO Score.

72. Plaintiff's bankruptcy was discharged on October 1, 2019.

F. **Plaintiff's Credit Report Contains Inaccurate Adverse Tradelines, which Plaintiff Disputed to no Avail**

73. On November 13, 2019, Plaintiff ordered a three-bureau credit report from Equifax to ensure proper reporting by Plaintiff's creditors (the "November 13 Credit Reports").

74. Plaintiff noticed adverse tradelines in his November 13 Credit Reports, reporting inaccurate, misleading, or incomplete information that did not comply with credit reporting industry standards.

75. Plaintiff then disputed the inaccurate tradelines (regarding accounts with Bank of the West) via certified mail to Equifax on or about November 20, 2019 (the "Dispute Letter").

76. Plaintiff's Dispute Letter specifically put Bank of the West on notice that Plaintiff filed for bankruptcy, received a bankruptcy discharge, and that Plaintiff's accounts should be updated post discharge.

77. Plaintiff's Dispute Letter also detailed what was perceived to be problematic about the Bank of the West tradelines, and particularly addressed each tradeline individually.

78. Plaintiff requested that any derogatory reporting be updated.

79. Plaintiff is informed and believes that Equifax received Plaintiff's Dispute Letter and, in response, sent Plaintiff's dispute to the Defendant Bank via an ACDV through e-OSCAR.

80. On January 15, 2020, Plaintiff ordered a second credit report from Equifax to determine if his account was updated.

  a.  **Inaccuracy – Bank of the West**

81. Defendant Bank, continued to report to Equifax that Plaintiff's account, beginning in 374546XXX, had an unpaid balance of $58,395.

82. Plaintiff alleges that Defendant Bank did not investigate whether Plaintiff filed for bankruptcy.

83. Defendant Bank did not update the tradeline to reflect that Plaintiff obtained a discharge in bankruptcy.

84. The Credit Reporting Agencies provided notice to Bank of the West that Plaintiff was disputing the inaccurate and misleading information, but Bank of the West failed to conduct a reasonable investigation of the information as required by the Fair Credit Reporting Act.

85. Based on Plaintiff's dispute, Bank of the West should have known that Plaintiff received a discharge in his bankruptcy proceedings.

86. The most basic investigation would include a simple review of well-established credit reporting industry standards on how to report a bankruptcy.

87. Plaintiff alleges that Bank of the West did not review well-established industry standards for credit reporting.

88. If Bank of the West reviewed such standards, Bank of the West would have seen that its reporting was not in compliance and was therefore inaccurate or incomplete.

89. Bank of the West should have updated the CII to Metro 2 Code "E" to reflect the debt was discharged in Plaintiff's Chapter 7 bankruptcy.

90. By continuing to report Plaintiff's account as a bad debt, it appears that the account was not included and discharged in Plaintiff's Bankruptcy.

91. Bank of the West's lack of investigation is unreasonable.

**G. Damages**

92. Plaintiff pulled the credit reports at issue at a cost for access to the report, after the dispute process, specifically for the sole purpose of verifying that the inaccuracies were fixed.

93. As a result of the incorrect reporting, Plaintiff has also suffered emotional harm and excessive stress resulting in doubt as to the effectiveness of the Bankruptcy Code and the power of this Court to preserve and perpetuate a fresh start as intended by Congress.

94. Plaintiff has been denied credit and is unable to rebuild his credit based on the inaccurate reporting by the Defendant Bank.

95. The Defendant Bank's actions, as alleged herein, are in direct violation of the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b).

## FIRST CAUSE OF ACTION
## (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681e(b))
## (Against Defendants and Does 1-100)

96. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   Equifax Failed to Assure Credit Reporting Accuracy**

97. Equifax (the "CRA Defendant") violated 15 U.S.C. § 1681e(b) by failing to establish and/or follow reasonable procedures to assure maximum possible accuracy in the preparation of Plaintiff's credit reports and the credit files it published and maintained concerning Plaintiff.

98. Had the CRA Defendant maintained reasonable procedures to assure maximum accuracy, the CRA Defendant would never have allowed the Defendant Bank to report the accounts as described herein.

99. Equifax knew, or should have known, (1) that the Bank of the West account was included and discharged in bankruptcy and (2) that the Bank of the West account should not have been reported as an open account with an unpaid balance of $58,395, on account of the Chapter 7 discharge.

100. As a result of the CRA Defendant's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit and other mental and emotional distress.

**B.   Willful Violations**

101. The CRA Defendant's violations, as described herein, were willful; specifically, the Credit Bureaus, including Defendant Equifax, have intentionally and purposefully set up a system where inaccuracies are not only probable, but inevitable.

102. The CRA Defendant regularly, as a policy, ignores disputes by consumers and fails to perform even a basic investigation regarding the dispute. Additionally, the CRA Defendant regularly fails to forward disputes to data furnishers, thereby frustrating the entire dispute process.

103. To the extent the CRA Defendant does send consumer disputes, the CRA Defendant sends these disputes to employees who do not live within the continental United States to hide or subvert a consumer's liability to confront the individual(s) directly responsible for approving accurate reporting.

104. The CRA Defendant's employees receive little to no training concerning how to accurately report consumer debt.

105. Instead, the CRA Defendant's employees are instructed to parrot whatever information a data furnisher provides regardless of whether the information is accurate.

106. The CRA Defendant's employees are regularly expected to review and approve over ninety (90) disputes per day, rendering less than five (5) minutes to review, investigate, and respond to each dispute received.

107. The CRA Defendant has intentionally set up this system in order to undermine, hide, and otherwise frustrate consumers' ability to properly dispute and correct credit reports.

108. As a result of the CRA Defendant's violation of 15 U.S.C. § 1681e(b), Plaintiff suffered actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, dissemination of inaccurate information, diminished credit, and other mental and emotional distress.

109. The CRA Defendant's violations were willful, rendering the Defendant liable for punitive damages in an amount to be determines by the Court pursuant to 15 U.S.C. § 1681n.

110. In the alternative, the CRA Defendant was negligent, which entitles Plaintiff to recover under 15 U.S.C. § 1681o.

111. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendant in an amount to be determined by this Honorable Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## SECOND CAUSE OF ACTION

**(Violation of Fair Credit Reporting Act 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1))**

**(Against Defendants and Does 1-100)**

112. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The Defendant Bank Failed to Reinvestigate Following Plaintiffs Dispute**

113. Pursuant to 15 U.S.C. §§ 1681s-2(b) and 1681i(a)(1), data furnishers are prohibited from providing any information relating to a consumer to any CRA if it knows, or has reasonable cause to believe, that the information is inaccurate or misleading and requires data furnishers to update and/or correct inaccurate information after a CRA notifies it of a consumer dispute.

114. Bank of the West violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation and re-reporting misleading and inaccurate account information.

115. Equifax provided notice to Bank of the West that Plaintiff was disputing the inaccurate and misleading information; however, Bank of the West failed to conduct a reasonable investigation as required by the FCRA.

116. Based on Plaintiff's dispute, the Bank of the West should have known its respective accounts were included in Plaintiff's Chapter 7 bankruptcy and ceased their inaccurate reporting.

117. The lack of investigation, as required by the FCRA, is unreasonable.

**B.    Willful Violations**

118. Plaintiff further alleges that the Defendant Bank has not properly trained those directly investigating disputes on Metro 2 generally or credit reporting industry standards and, as such, have developed reckless policies and procedures.

119. Plaintiff alleges that rather than train its employees on accurate credit reporting and industry standards, the Defendant Bank's employees tasked with reviewing disputes are expected to confirm the information being reported as accurate instead of investigating the reporting.

**C.    The CRA Defendant Failed to Reinvestigate the Disputed Information in violation of 15 U.S.C. § 1681i(a)(1)**

120. Pursuant to 15 U.S.C. 1681i(a)(1), the CRA Defendant was required to conduct a reasonable investigation and to delete any information that was not accurate after receiving notice of Plaintiff's dispute regarding the Bank of the West account.

121. Thus, the CRA Defendant failed to conduct a reasonable investigation and correct the misleading and/or inaccurate statements on the account within the statutory time frame.

122. The CRA Defendant is not a passive entity bound to report whatever information a data furnisher provides.

123. Plaintiff alleges the CRA Defendant is readily familiar with Metro 2 guidelines and credit reporting industry standards.

124. Based on the foregoing, Plaintiff alleges that the CRA Defendant can, and does, suppress inaccurate information from being reported when data furnishers provide inaccurate information.

125. Equifax can and does instruct data furnishers on how to properly report certain accounts from time to time upon request from a data furnisher.

126. The CRA Defendant failed to conduct a reasonable investigation because any basic investigation would have uncovered that the Defendant Bank was not reporting the account at issue correctly.

127. Had the CRA Defendant conducted a proper investigation it could have closed or bookended the Bank of the West debt by adding a notation on the credit report on their respective tradeline that the debt was in fact included and discharged in Plaintiff's Chapter 7 bankruptcy.

128. The CRA Defendant continued to report the account as an open account with an unpaid balance of $58,395.

129. The CRA Defendant, therefore, did not do the most basic investigation regarding credit reporting industry standards, otherwise the aforementioned would have been uncovered.

## THIRD CAUSE OF ACTION

### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(4))

### (Against Defendants and Does 1-100)

130. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.   The CRA Defendant Failed to Review and Consider all Relevant Information**

131. The CRA Defendant violated 15 U.S.C. § 1681i(a)(4) by failing to review and consider all relevant information submitted by Plaintiff.

132. The CRA Defendant's violation of 15 U.S.C. § 1681i(a)(4) has caused Plaintiff to suffer actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.   Willful Violations**

133. The CRA Defendant's violations were willful, rendering the Defendant individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

134. In the alternative, the CRA Defendant was negligent in failing to review and consider all relevant information Plaintiff submitted, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

135. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## FOURTH CAUSE OF ACTION
### (Violation of Fair Credit Reporting Act 15 U.S.C. § 1681i(a)(5)(A))
### (Against Defendants and Does 1-100)

136. Plaintiff re-alleges and incorporates the allegations in each and every paragraph above by reference as if fully stated herein.

**A.    The CRA Defendant Failed to Delete Disputed and Inaccurate Information**

137. The CRA Defendant violated 15 U.S.C. § 1681i(a)(5)(A) by failing to promptly delete the disputed inaccurate items of information from Plaintiff's credit file or modify the item of information upon a lawful reinvestigation.

138. The CRA Defendant's violation of 15 U.S.C. § 1681i(a)(5)(A), has resulted in Plaintiff suffering actual damages, including, but not limited to: damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

**B.    Willful Violations**

139. The CRA Defendant's violations were willful, rendering the Defendant liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

140. In the alternative, the CRA Defendant was negligent, which entitles Plaintiff to recovery under 15 U.S.C. § 1681o.

141. Plaintiff is entitled to recover actual damages, statutory damages, costs and attorneys' fees from the CRA Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

142. WHEREFORE, Plaintiff prays for judgment as follows:

   a. For preliminary and permanent injunctive relief to stop Defendants from engaging in the conduct described above;

   b. Award statutory and actual damages pursuant to 15 U.S.C. § 1681n;

c.  Award punitive damages in order to deter further unlawful conduct pursuant to 15 U.S.C. § 1681n;

d.  Award attorneys' fees and costs of suit incurred herein pursuant to 15 U.S.C. §§ 1681n and 1681o;

e.  For determination by the Court that Defendant's policies and practices are unlawful and in willful violation of 15 U.S.C. § 1681n, *et seq.*; and

f.  For determination by the Court that Defendant's policies and practices are unlawful and in negligent violation of 15 U.S.C. § 1681o.

Respectfully submitted,

**PERRY, SHIELDS, CAMPBELL, FLOYD, PLLC**

Dated: January 24, 2020

*/s/ Kyle Schumacher*
Kyle Schumacher
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of this matter by jury.

                                            **PERRY, SHIELDS, CAMPBELL, FLOYD, PLLC**

Dated: January 24, 2020                    */s/ Kyle Schumacher*
                                            Kyle Schumacher
                                            Attorneys for Plaintiff